IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| Jerome Myers, #258396, ) | |
| ) | Civil Action No. 6:09-1076-CMC-KFM |
| Petitioner, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Gregory Knowlin, Warden of ) | |
| Turbeville Correctional Institution, ) | |
| ) | |
| Respondent. ) | |
| _____) | |

The petitioner, a state prisoner proceeding *pro se*, seeks habeas corpus relief pursuant to Title 28, United States Code, Section 2254.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Local Rule 73.02(B)(2)(c), D.S.C., this magistrate judge is authorized to review posttrial petitions for relief and submit findings and recommendations to the District Court.

**BACKGROUND OF THE CASE**

The record reveals the petitioner is currently confined in the Turbeville Correctional Institution of the South Carolina Department of Corrections ("SCDC") as the result of his Richland County conviction and sentence. The Richland County Grand Jury indicted the petitioner at the December 2002 term of court for criminal sexual conduct ("CSC") in the first degree (02-GS-40-05319) and kidnaping (02-GS-40-05318). Attorney Jason Thomas King represented him on these charges. On April 21, 2003, he received a jury trial before the Honorable James R. Barber, III. The jury found him guilty as charged, and Judge Barber imposed a sentence of 12 years imprisonment, concurrent, for each offense. This sentence was ordered to run consecutively to the petitioner's probation

revocation sentence of three years imprisonment on 99-GS-43-809 that was imposed at the same sentencing hearing.[1]

The petitioner timely served and filed a notice of appeal. Assistant Appellate Defender Aileen P. Clare represented him on appeal.  On June 18, 2004, the petitioner filed his final brief of appellant, in which he presented the following issue for review:

> Did the lower court abuse its discretion by not permitting appellant to impeach the complaining witness with her history of making false allegations of sexual assault?

The State filed a final brief of respondent on June 30, 2004.  Senior Assistant Attorney General Norman Mark Rapoport represented the State on appeal.

On February 7, 2005, the South Carolina Court of Appeals affirmed the petitioner's convictions and sentence in a *per curiam* opinion.  *State v. Jerome Myers,* 05-UP-088 (S.C. Ct. App, Feb. 7, 2005).  It sent the remittitur to the Richland County Clerk of Court on February 23, 2005.

The petitioner filed a *pro se* post-conviction relief ("PCR") application (05-CP-40-1519) on April 5, 2005, in which he raised the following grounds for relief:

(1)    Ineffective assistance of counsel in that:

    a.    Counsel failed to object to the wording of the indictment;

    b.    Counsel failed to prepare a defense/offer any evidence of a defense;

    c.    Counsel failed to suppress the photo identification as prejudicial;

    d.    Counsel failed to object to bolstering and vouching of the victim;

    e.    Counsel failed to impeach or discredit the witness with two prior allegations of rape;

---

[1]Judge Barber also ordered the petitioner to pay applicable costs and assessments for each sentence, and to pay $ 100.00 on each of the surcharges within 90 days of his release from SCDC. The petitioner was given credit for 307 days of time served.

2

    f.  Counsel failed to object to the fingerprint analysis; and

    g.  Counsel failed to object to withholding valuable DNA evidence.

  (2)  Newly-discovered evidence.

The State filed its return on January 6, 2006. It filed an amended return on June 8, 2006.

  The Honorable William P. Keesley held an evidentiary hearing into the matter on April 18, 2007, at the Richland County Courthouse. The petitioner was present at the hearing and represented by attorney Charlie J. Johnson, Jr. Assistant Attorney General Robert L. Brown represented the State. The petitioner testified on his own behalf at the hearing, while the State presented the testimony of trial counsel, Mr. King.

  On June 14, 2007, Judge Keesley filed a partial order of dismissal denying relief and dismissing the application with prejudice on the ineffective assistance of counsel allegations raised by the petitioner. The order specifically addressed the petitioner's claims that trial counsel was ineffective because he (1) failed to object to the wording of the indictment; (2) failed to prepare a defense or offer any evidence of a defense; (3) failed to suppress the photo identification as prejudicial; (4) failed to object to bolstering and vouching of the victim; (5) failed to impeach or discredit the witness with two prior false allegations of rape; (6) failed to object to the fingerprint analysis; (7) failed to object to withholding valuable DNA evidence; and (8) failed to request a lesser-included offense of assault and battery of a high and aggravated nature ("ABHAN"). As to the allegation of newly-discovered evidence, Judge Keesley found that the issue must be continued for the petitioner to have the opportunity to present evidence to support the claim at a subsequent term of PCR in Richland County (App. 616).

  The Honorable J. Michelle Childs held an evidentiary hearing into the newly-discovered evidence claim on June 7, 2007, at the Richland County Courthouse. The petitioner was present at the hearing and Mr. Johnson again represented him. Assistant

3

Attorney General Brown again represented the respondent. Amos Jones was the only witness at this hearing. On July 27, 2007, Judge Childs filed an order of dismissal, in which she denied relief and dismissed the application with prejudice, on the petitioner's contention that he was entitled to a new trial based upon newly-discovered evidence.

The petitioner timely served and filed a notice of appeal. Assistant Appellate Defender Robert M. Pachak represented him in collateral appellate proceedings. On March 18, 2008, Mr. Pachak filed a *Johnson* petition for writ of certiorari[2] on the petitioner's behalf and petitioned to be relieved as counsel. The only question presented in the *Johnson* petition was stated as follows:

> Whether defense counsel was ineffective in failing to request a jury instruction on the lesser-included offense of assault and battery of a high and aggravated nature?

The petitioner subsequently filed "Petitioner's Pro Se Brief for Writ of Certiorari," in response to the *Johnson* petition. The petitioner's brief presented the following issues for review:

> (1)     Trial counsel was ineffective for [failing] to object to the improper wording of the indictment. ... [T]rial counsel was further ineffective for [failing] to request that the trial judge charge the jury with the lesser-included offense, that being ABHAN, after both the trial and solicitor had noticed that the wording for the indictment was improper for this charge.
>
> (2)     Appellant's trial counsel was ineffective for not preparing a defense and for [failing] to offer any evidence on behalf of the Appellant.
>
> (3)     [Appellant's trial counsel was ineffective for failing] to suppress photos, in photo line-up and object because photos were highly prejudicial.
>
> (4)     [Trial counsel was ineffective for failing] to object to the solicitor's continuous bolstering and vouching and pitting of the alleged victim ....

_____

[2]*Johnson v. State*, 364 S.E.2d 201 (S.C. 1988).

(5)    [Trial counsel was ineffective for failing] to object and show evidence that the alleged victim was not a credible witness.

(6)    [Trial counsel was ineffective for failing] to object to [the] fingerprint and analysis of fracture.

(7)    Trial counsel and [the] State withheld valuable evidence.

(8)    Newly discovered evidence.

(9)    Conclusion of trial counsel's ineffective assistance and prejudicial error.

(10)    Appellant's trial counsel was ineffective for [failing] to object to and preserve these issues for appeal and any other issues that may have been affected by the Appellant's counsel's deficient performance.

(11)    The trial judge never ruled on the DNA evidence.

(12)    The Appellant's trial counsel was ineffective [for] not asserting and requesting that the trial judge instruct the jury and charge the law as it pertains to the charge of CSC third degree when the evidence specifically pointed to the fact the victim was mentally defective (retarded), and the State knew beforehand that the victim was retarded and the only evidence the State presented at trial was of the victim being slow mentally (retarded).

(13)    The Appellant submits that the DNA evidence was never entered into evidence, and will prove that the Appellant is not guilty [of] the offenses that he was charged with.

The South Carolina Court of Appeals filed an order denying certiorari and granting counsel's petition to be relieved on May 29, 2009.  It sent the remittitur to the Richland County Clerk of Court on June 16, 2009.

## UNDERLYING FACTS

The victim, M., was a minor when the crimes occurred.  She testified that she was living at the Cambridge House, a halfway house in Columbia, for treatment of a drug

5

problem. She admitted having a history of mental illnesses for "most all of my life." Her mother placed her in foster care when she was nine.

On the evening of June 11, 2002, the victim and Virginia Rose ("Vee") took a bus to Richland Mall from the Cambridge House. They left the mall shortly before 9:00 to catch a bus home. In the parking lot, they were approached by the petitioner. The victim had met him a few weeks before and she knew him as "Reverend J." The petitioner offered her and Vee a ride home, and they accepted. On the way home, the petitioner offered to help them and the Cambridge House with funds from his church.

Once they arrived home, Vee left the car, but the victim stayed with the petitioner. The petitioner told the victim that he did not have the money with him, and he asked for permission to take her to get it. The victim testified that the director of the Cambridge House allowed her to go with the petitioner. The petitioner handed the victim a piece of paper with the phone number for the "Family World Center," and the victim put the paper in her back pocket.

The petitioner then drove with the victim to his home in the Spring Valley Trailer Park around 9:00 p.m. The victim testified that she went inside to get a drink of water. The petitioner then made advances toward her inside the trailer. She resisted him, and she told him to take her home before curfew. However, he refused to do. Instead, the petitioner took off his pants and told her to touch his penis. When the victim tried to get to the door, the petitioner grabbed her and threw her onto the couch. He told the victim she was not leaving until she "gave him what he wanted." Then, the petitioner kissed the victim's stomach and forced his fingers into her vagina. He told the victim, "I need you to . . . jack me off." The victim wiped the petitioner's semen on her pants.[3] The victim had several bruises on her arms and back as a result of her struggle with the petitioner. The petitioner then drove the

---

[3] The police were unable to detect any semen on the victim's pants (App. 339-40, 378-80).

petitioner back to the Cambridge House around 10:45 p.m. The victim told Vee about the assault and the police were contacted.

Vee testified at trial and corroborated the victim's story. Vee said that she felt more comfortable about going along with the petitioner when she discovered he was a reverend. She testified that the petitioner offered to help the Cambridge House with his church. He also wrote down his information on a piece of paper when she went inside the Cambridge House to use the telephone.

Vee testified that she roomed with the victim and that she was concerned when the victim did not come home. When the victim finally returned, she had "the deer in the headlights look." The victim then told her what happened.

Deputy Steven Dauway met with the victim about 45 minutes later. He testified that she was "visibly shaken" and "crying." She reported the assault to Dauway, and she gave Dauway a description of her assailant and his car. She also handed over the piece of paper given to her by the petitioner.

The victim drove the police to the location of the assault a few days later. As a result of the victim's information, the police prepared a photographic line-up. On June 19, the victim positively identified the petitioner as her assailant.

An arrest warrant was served on the petitioner on June 20, and the police received consent to search the trailer. The police seized a daytimer. The evidence showed that the note (State's Exhibit 19) was torn from the daytimer, and the petitioner's fingerprints were found on State's Exhibit 19. The church and the telephone number written by the petitioner on State's Exhibit 19 were fictitious.

After his arrest, the petitioner agreed to give a written statement to the police. He told the police that he worked from about 7:30 p.m. on June 11 until 6:00 a.m. the next morning. He claimed that he did not go to Richland Mall, and he denied giving the victim and

7

Vee a ride or sexually assaulting the victim in his trailer. However, the petitioner's employer testified that he did not work that evening.

The petitioner's probation agent also testified that the petitioner received electronic monitoring for a prior crime. Stacey Bartkovich said that her records for June 11 indicated that the petitioner had left his home at 7:36 that evening, and he returned at 9:32 p.m. He left again at 10:11 p.m., and he returned shortly after midnight

## HABEAS ALLEGATIONS

The petitioner raised the following allegations in his *pro se* petition for relief:

GROUND ONE: Petitioner was deprived of effective assistance of counsel in violation of his Sixth Amendment right.
SUPPORTING FACTS: Petitioner has fourteen (14) issues of ineffective assistance of counsel. Thirteen (13) issues are attached to this application. (1) Counsel's failure to object to the reconstructive amendment of the indictment during trial, where the State introduced different methods of sexual battery and were not in the indictment was highly prejudicial. Thirteen (13) additional issues is submitted with this application as an attachment (see attachment).

GROUND TWO: Actual innocence (new evidence).
SUPPORTING FACTS: Petitioner asserts there is no physical nor forensic evidence to support either conviction. Petitioner has been tested four different times for D.N.A. evidence that were "NEGATIVE". The alleged victim's own sister has contacted Aileen Clare (Appellate attorney) and written me a letter about her sister's "history" of falsely accusing innocent people including myself. The "LETTER" is submitted as an attachment (See Attachment).

On July 21, 2009, the respondent filed a motion for summary judgment. By order filed August 3, 2009, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the petitioner was advised of the summary judgment dismissal procedure and the possible consequences if he failed to adequately respond to the motion. The petitioner filed his opposition to the motion on August 24, 2009, and a motion for evidentiary hearing on October 7, 2009.

On February 10, 2010, the Honorable William M. Catoe, then United States Magistrate Judge, recommended that the motion for summary judgment be granted as to the allegations presented in the petition and the first three allegations presented in the attachment to the petition. The court noted that the respondent failed to address the remaining ten allegations (allegations 4-13 in the attachment to the petition). The court recommended that the respondent be given an opportunity to file a dispositive motion as to the remaining issues.

By order filed March 12, 2010, the Honorable Cameron McGowan Currie, United States District Judge, adopted the court's recommendation, dismissed the allegations in Ground One that were addressed in the respondent's motion for summary judgment along with Ground Two (Actual Innocence, New Evidence claim) and remanded the case for further proceedings. The respondent was given an opportunity to file a supplemental return and dispositive motion as to the unaddressed grounds. On April 29, 2010, the respondent filed his Supplemental Return and Memorandum of Law in Support of Motion for Summary Judgment. By order filed May 3, 2010, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the petitioner was again advised of the summary judgment dismissal procedure and the possible consequences if he failed to adequately respond. The petitioner filed his opposition to the supplemental return on May 26, 2010.

Based upon the foregoing, the petitioner's allegations now before this court are as follows:

**GROUND ONE**

(4)     [Trial counsel was ineffective for failing] to object to the solicitor's continuous bolstering and vouching and pitting of the alleged victim ....

(5)     [Trial counsel was ineffective for failing] to object and show evidence that the alleged victim was not a credible witness.

9

(6)     [Trial counsel was ineffective for failing] to object to [the] fingerprint and analysis of fracture.

(7)     Trial counsel and [the] State withheld valuable evidence.

(8)     Newly discovered evidence.

(9)     Conclusion of trial counsel's ineffective assistance and prejudicial error.

(10)     Appellant's trial counsel was ineffective for [failing] to object to and preserve these issues for appeal and any other issues that may have been affected by the Appellant's counsel's deficient performance.

(11)     The trial judge never ruled on the DNA evidence.

(12)     The Appellant's trial counsel was ineffective [for] not asserting and requesting that the trial judge instruct the jury and charge the law as it pertains to the charge of CSC third degree when the evidence specifically pointed to the fact the victim was mentally defective (retarded), and the State knew beforehand that the victim was retarded and the only evidence the State presented at trial was of the victim being slow mentally (retarded).

(13)     The Appellant submits that the DNA evidence was never entered into evidence, and will prove that the Appellant is not guilty [of] the offenses that he was charged with.

(Doc. no. 1-3).


### APPLICABLE LAW AND ANALYSIS

Title 28, United States Code, Section 2254(d) and (e) provides in pertinent part as follows:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(d), (e).

The Fourth Circuit Court of Appeals has stated as follows regarding the standard of review in cases, like the instant case, that are governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

For a claim that was adjudicated on the merits in state court proceedings, this Court will not issue a writ of habeas corpus under the AEDPA unless (a) the state court decision is in "square conflict" with Supreme Court precedent that is controlling as to law and fact or (b) if no such controlling decision exists, "the state court's resolution of a question of pure law rests upon an objectively unreasonable derivation of legal principles from the relevant [S]upreme [C]ourt precedents, or if its decision rests upon an objectively unreasonable application of established principles to new facts." *Green v. French*, 143 F.3d 865, 870 (4th Cir.1998). "In other words, habeas relief is authorized only when the state courts have decided the question by interpreting or applying the relevant precedent in a manner that reasonable jurists would all agree is unreasonable." *Id.* When a petitioner has properly presented a claim to the state court but the state court has not adjudicated the claim on the merits, however, our review of questions of law and mixed questions of law and fact is de novo. *See Jones v. Jones*, 163 F.3d 285, 299-300 (5th Cir.1998) (applying pre-AEDPA de novo standard of review to claims of ineffective assistance of counsel that were properly raised, but not adjudicated on merits in state court).

*Weeks v. Angelone*, 176 F.3d 249, 257-58 (4th Cir. 1999).

11

***Ground One (4) - Failure to Object to Solicitor***
***Bolstering and Vouching for Alleged Victim***

The petitioner asserts that trial counsel was ineffective for not objecting to the Assistant Solicitor continuously bolstering and "pitting" the testimony of the alleged victim. The respondent argues that the state courts' rejection of the petitioner's claim was not "contrary to" and did not involve an "unreasonable application of" clearly established United States Supreme Court precedent. This court agrees.

The petitioner testified that trial counsel should have objected to the Assistant Solicitor repeatedly arguing that the "victim was telling the truth, after [s]he [knew] the DNA was negative and that they came back and got another blood sample, which was done by the Department of Corrections on 5/6/2003" (App. 546). Specifically, he complains of the following portions of the Assistant Solicitor's closing argument:

> She came in here yesterday and she testified truthfully. She told you that, yes, she was a patient of Columbia Area Mental Health. She had been a patient of Columbia Area Mental Health for several years.
>
> She did come in here and was truthful to you and she explained to you that she was mildly mentally retarded. I believe that she - - you've heard the words, I heard them, anorexia, bulimia, seizure disorders, bipolar personality disorder, things of that nature. The one thing that she is sure of is that she is, in fact, mildly mentally retarded.
>
> She came in here and she was truthful to you and also stated that she had a problem - - she had a problem with crack cocaine in the past from living in a bad foster parent type situation.

(App. 402 -403).

> So she was truthful about all of that.
>
> And I also asked her, if you remember, if she knew the difference between a truth and a lie. She stated she did. She told us the differences between a truth and a lie. And she did state under oath that she would tell you the truth about what happened.

(App. 403).

12

> . . . it's not that she's lying about anything, she just didn't tell the whole truth. She didn't add in the part about digital penetration.

(App. 410).

> She came in here to y'all, she was forthright. She was honest.

(App. 425).

The PCR judge (Judge Keesley) denied relief on this allegation. He found as follows:

> As to the allegation of ineffective assistance of counsel in that counsel failed to object to bolstering and vouching of the victim, this Court finds this claim is without merit. Applicant failed to present any evidence to establish that the prosecutor vouched or bolstered the credibility of any of the state witnesses. Accordingly, this allegation is denied and dismissed.

(App. 613). The state supreme court subsequently denied certiorari without comment.

Claims of ineffective assistance of counsel are governed by the two-part test established in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the petitioner "must show that counsel's performance was deficient." *Id.* at 687. To prove deficiency, the petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Second, the petitioner must show that the deficient performance actually prejudiced him, *i.e.* "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Finally, the Court in *Strickland* held that "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies," and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.* at 697.

The United States Supreme Court has made clear that a petitioner is not entitled to relief based upon the closing argument of a prosecutor, unless that argument so infected the trial with unfairness as to make the resulting conviction a denial of due process.

13

*Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). The standard in *Donnelly* is a very high standard for a defendant to meet. "'[I]t is not enough that the remarks were undesirable or even universally condemned.'" *State v. Tubbs*, 509 S.E.2d 815, 818 (S.C. 1999) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). "In order to make an appropriate assessment, the reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo." *United States v. Young*, 470 U.S. 1, 12 (1985).

In *State v. Durden*, 212 S.E.2d 587 (S.C. 1975), the state supreme court set forth examples of permissible closing arguments by prosecutors:

> "So long as he stays within the record and its reasonable inferences, the prosecuting attorney may legitimately appeal to the jury to do their full duty in enforcing the law, or to return the verdict which he conceives it to be their duty to return under the evidence, and it may employ any legitimate means for impressing on them their true responsibility in this respect, as by stating that a failure to enforce the law begets lawlessness. Thus, he may in effect tell them that the people look to them for protection against crime, and may illustrate the effect of their verdict on the community or society generally with respect to obedience to, and for enforcement of, the law; he has the right to dwell on the evil results of crime and to urge a fearless administration of the criminal law; and he may ask for a conviction, or assert the jury's duty to convict. He may argue with reference to any matter which the jurors may properly consider in arriving at their verdict, and may point out as well the matters which they should not consider."

*Id*. at 590 (quoting 23A C.J.S. Criminal Law §1107).

A prosecutor may neither vouch for nor bolster the testimony of a government witness in arguments to the jury. *United States v. Sanchez*, 118 F.3d 192, 198 (4th Cir.1997). "Vouching occurs when the prosecutor indicates a personal belief in the credibility or honesty of a witness; bolstering is an implication by the government that the testimony of a witness is corroborated by evidence known to the government but not known to the jury." *Id*. Prosecutorial "vouching for the credibility of witnesses and expressing his personal opinion

14

concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *See*

*Young*, 470 U.S. at 18-19 (citing *Berger v. United States*, 295 U.S. 78, 88-89 (1935)).

As argued by the respondent, when placed in proper context, *see Young*, 470 U.S. at 19, the Assistant Solicitor's comments did not constitute impermissible vouching. These remarks did not suggest, in any fashion, that the Assistant Solicitor was relying on information apart from the evidence presented at trial, and these remarks cannot be read as implying that she had access to evidence outside of the record. Likewise, she did not imply that DNA evidence corroborated the victim's testimony or otherwise misstate the evidence before the petitioner's' jury, and she did not urge jurors to let her judgment supplant the collective judgment of the jury. Rather, the Assistant Solicitor was merely attempting to urge jurors that the victim had honestly testified about all aspects of her life: that she had a history of mental health issues, that she was mildly mentally retarded, that she had a substance abuse problem, and that the petitioner had sexually assaulted her. She also argued that the victim's testimony was supported and corroborated by the other evidence in the case and that the victim had always been consistent with respect to the perpetrator, even if she had not immediately told everything that he had done to her (such as digitally penetrating her) (App. 399-427).

The remarks at issue were made in anticipation of trial counsel's closing argument, and they were extremely important given defense counsel's subsequent efforts to question the victim's credibility (App. 427-36). *See Young*, 470 U.S. at 12 ("In order to make an appropriate assessment, the reviewing court must not only weigh the impact of the

prosecutor's remarks, but must also take into account defense counsel's opening salvo"). As in *Young*, "[t]he jury surely understood the comment[s] for what [they were]" - a rebuttal to defense counsel's assault on the credibility of the prosecution's case. *Id.* at 19.

Furthermore, there is no evidence of witness pitting. As explained by the state supreme court, "[n]o matter how a question is worded, anytime a solicitor asks a defendant to comment on the truthfulness or explain the testimony of an adverse witness, the defendant is in effect being pitted against the adverse witness. This kind of argumentative questioning is improper." *Burgess v. State*, 495 S.E.2d 445, 447 (S.C. 1998) (citations omitted). The petitioner has failed to show evidence of witness pitting.

The petitioner has failed to show that his trial counsel was deficient in failing to object in this regard. Further, he has failed to show that he suffered prejudice as a result. Based upon the foregoing, this claim fails.

### Ground One (5) - Failure to Object and Show Evidence that Alleged Victim was not a Credible Witness

The petitioner next contends that counsel was ineffective for failing to object to the victim's lack of credibility and failing to present evidence that the victim was not a credible witness. The respondent argues that the state courts' rejection of the petitioner's claim was not "contrary to" and did not involve an "unreasonable application of" clearly established United States Supreme Court precedent. This court agrees.

On trial counsel's motion, the trial judge held an *in camera* pretrial hearing on the issue of whether the defense could impeach the victim with her previous supposedly false reports that she had been raped. Trial counsel argued that this bore upon the victim's credibility. In support of this motion, trial counsel called Dr. Stephen I. Merlin, whom the trial judge qualified "as an expert in the area of general medicine and addictive treatment and related psychiatric care and treatment and diagnosis to those matters" (App. 80-83). Dr. Merlin had treated the victim in 2001 and 2002. He testified about the victim's addiction to

16

cocaine and her mental health history, explaining the diagnoses that had been given. Dr. Merlin also testified about the victim's supposed falsely reportings of sexual assault in 1999 and 2001 (App. 83-99). The State proffered testimony from the victim in response (App. 100-08).

Trial counsel then argued that he should be permitted to cross-examine the victim "about the prior allegation of rape in '99 and 2001" under *State v. Boiter*, 396 S.E.2d 364 (S.C. 1990) (trial judge did not abuse his discretion by refusing to allow defense counsel to cross-examine 17-year-old victim, defendant's stepdaughter, about a prior allegation of sexual abuse by her biological father, where the defense presented no evidence to establish its falsity and the accusation nine years earlier was too remote to be of sufficient probative value). In addition to Dr. Merlin's testimony that these reports were false, counsel argued that "[t]he police were never called on these two allegations. She was referred to Richland Springs, which is mainly for substance abuse not for someone who has been raped." Thus, trial counsel argued the prior incidents were probative on whether the charges against the petitioner "could be false allegations. It is possible someone could be raped two times counting it as three times, but I think that the more allegations you make of a rape, the more likely it is that it's false" (App. 108-09).

Trial counsel further argued that the victim's "history of mental illness" and her diagnosis of "Borderline personality, when you factor that in, that also is something to consider" because Dr. Merlin had testified that "[i]t's more likely that someone would make something up if they have borderline personality." Additionally, counsel argued that the victim was an adult and that the prior false accusations were not remote in time. He then addressed the facts in the present case that he felt were similar to the prior accusations and that supported the defense theory that she falsely accused the petitioner (App. 109-12).

After listening to arguments by the State (App. 112-15), the trial judge denied trial counsel's motion:

All right. I'm going to go ahead and deny the motion to be able to cross-examine on the [the victim's prior reports of rape] for impeachment purposes. You know, first of all, I didn't hear your physician say that the first -- the incident in November of '99 was false. He said -- the way I understood it, he said that incident was consistent with what she reported to him, which -- in April of 2001, which he believes is false. . . . [S]o I certainly can't say that there is any truthfulness or no truthfulness as to that based on what you've presented.

With respect to the incident on April 25th of 2001, the fact that he gives an opinion, you know, I just -- based on that alone, I can't say that there's a falsity to it.

But to get to prong three, I mean, clearly, there is absolutely no similarities to any of these incidents. When she says she's raped on the two prior occasions in November of '99 and April of 2001, I mean, I take that to mean that somebody had sexual intercourse with her as opposed to a digital penetration. She's certainly made no accusation as to anybody -- those statements I don't believe to be accusatory, I believe to be something that she's providing for medical history or for her treatment purposes. There doesn't seem to be any similarity other than she alleges I had some unwanted contact with me[n], I believe, on two prior occasions.

I am concerned [that] she seems to be willing to say what she believes to be in her benefit from time to time whether it's true or whether it's false and that is, you know, I'm [] years old as opposed to [] years old because she thinks there's some benefit for telling that age, you know. And I don't know how to approach that to show that she has in the past shown an inconsistency in her ability to be truthful without getting into the fact that she made these accusations.

I certainly would be willing to listen to what you might want to tell me how you might want to cross-examine her, in that, isn't it true that you have given statements in the past that may not be true for whatever purposes you gave. But I'm certainly not going to allow -- because she has, although she wasn't under oath and, you know, she admits them and says I did it because I was trying to get out of a situation. I mean, I think that ends it because she's admitted the inconsistency. But, you know, she has shown that truth is not always part of what she's stated.

(App. 116-17).

The petitioner testified at the PCR hearing that Mr. King and Leslie Coggiola had represented him at trial. The State's only evidence that he had committed the crimes charged was the victim's statement. The State had taken samples of his blood and compared it to the DNA that t hey had "[f]ound on the victim clothes and the hair fiber that they had found on the victim." However, this did not match his DNA (App. 528; 530-32; 535; 546-47). He added that "I did not know this young lady, [nor] did I [do] anything to this young lady." He contended that her identification of him was tainted by police showing her an overly suggestive photographic lineup, in which he was the only person wearing a white shirt, since the victim described her assailant as wearing a bright white shirt (App. 533). He testified that trial counsel had only met with him twice before trial, for approximately 30 minutes total, and their last meeting was on the Sunday before the trial. Although the petitioner had given a list of potential witnesses "that could testify to my credibility and my whereabouts," counsel did not subpoena any of these witnesses. Also, counsel failed to investigate the crime scene, and he did not subpoena the rental car records that the petitioner had asked him to subpoena. The petitioner claimed that he protested counsel's decision to rest without presenting a defense because counsel refused to present the evidence that established his innocence (App. 535-38).

When asked why he had told the trial judge that he did not want to testify (App. 385-88), the petitioner testified that "I told the judge no[] because Mr. King advised me not to testify." Also, counsel told the petitioner "that he was going to call the DNA expert to testify on my behalf[,] . . . that he was going to present the evidence that I had given to him and that would exonerate me, the jury would have enough evidence to come back and bring a not guilty verdict." However, counsel did not present any evidence (App. 538-39).

As to the failure to impeach the victim's testimony, the petitioner testified that counsel "never subpoenaed the records from Mental Health stating her diagnosis, medication, and her credibility. He never subpoenaed the doctors that examined her, Dr.

19

Mohiuddin and Dr. Wideman, he never subpoenaed Dr. Merlin's testimony. He never subpoenaed the rent-a-car records. He never subpoenaed my witness to testify" (App. 547-48).

Trial counsel, Mr. King, testified that he was appointed to represent the petitioner, as a public defender, "in June of 2002"; that initially he represented the petitioner on separate, unrelated charges; and that he had already met with the petitioner by the time of his appointment in this case. Before trial, counsel "met with him three times at the jail and one telephone call." Counsel testified that they discussed all aspects of the case. "We discussed trial strategy. I went over the discovery with him." Also, "one of the big things in the case was . . . that . . . [t]here was no DNA, and there was a DNA report that said that the results were negative. So I did go over that with him. That was a huge part of the defense" (App. 550-51).

Counsel further explained that "one of my best arguments was that the victim claimed that there was semen, that he had ejaculated and she had rubbed semen on her pants. And they tested the pants for DNA, came back negative. So that was one of the big arguments I had in my case that she wasn't telling the truth" (App. 551). The petitioner had always maintained that he had not done anything to the victim and that he did not know her. So, counsel's defense strategy was "sort of an all-or-nothing strategy. Either he . . . did it or he didn't do it, but there was no in between." Thus, counsel reasonably believed that this defense was inconsistent with requests for the trial judge to charge on lesser-included offenses (App. 554-55).

The petitioner had provided counsel with the names of several character witnesses, and counsel remembered that the petitioner had provided him with "some receipts." However, there were not any alibi witnesses. Otherwise, counsel would have

presented an alibi defense (App. 555).[4]  As to the victim's prior reports of being raped,

counsel explained, "I subpoenaed . . . [and] I had her medical records.  And there were a

couple of indications where she had claimed she was raped before."  Counsel's review of

the medical records suggested that her reports were not credible.  "So I subpoenaed Dr.

Merlin, who came in."  Following an *in camera* hearing on whether he could utilize this

information to impeach the victim, the trial judge excluded the evidence.  However, counsel

felt that the issue had been preserved for appellate review (App. 556-57).

        In counsel's estimation, credibility was the primary issue in the case.  He

explained that his strategy was intended to preserve his right to the last closing argument:[5]

> My strategy was to not put up a defense. I had gotten what I
> thought I needed to make my argument from the victim. The
> victim admitted that she had mental illness. And she basically
> said on the stand that she had mental illness, she took
> medications, that she was mentally retarded. And I got all the
> information I needed from her.
>
> I discussed with Mr. Myers, [and] he didn't want to take the
> stand, so I was trying to get the last closing argument. And there
> was no witness I had that I felt would make any difference and
> it would cause me to lose the last closing argument.

(App. 555-56).

        The PCR judge denied this allegation, which he addressed as separate claims

that trial counsel (1) failed to prepare a defense or offer any evidence of a defense (App.

611-12) and (2) failed to impeach or discredit the witness with two prior allegations of rape

(App. 613). As to counsel's failure to prepare a defense or offer any evidence of a defense,

the PCR judge found:

---

[4]The petitioner's allegations in regard to the receipts and alibi and character witnesses were
previously addressed and rejected in Judge Catoe's Report and Recommendation, which was
adopted by Judge Currie (*see* 2/10/10 R&R at pp. 19-21, doc. no. 26; 3/12/10 Order adopting R&R,
doc. no. 34).

[5]South Carolina's procedural rules permit counsel of a defendant who calls no witnesses and
offers no evidence to have the concluding argument to the jury. *See State v. Mouzon*, 485 S.E.2d
918, 921 (S.C. 1997).

As to the allegation of ineffective assistance of counsel in that counsel failed to prepare a defense or offer any evidence of a defense, this Court finds this claim is without merit. Counsel testified that Applicant always maintained that he had not done anything to the victim. Counsel testified that his defense was that Applicant did not do the crime. Counsel testified that credibility was the primary issue in the case and that he felt it best to attack the State's case through cross-examination of their witnesses and through strong closing argument. Counsel testified that he discussed whether Applicant should testify and chose not to put Applicant on the stand in order to preserve the last argument. The record reflects that Applicant made numerous pre-trial motions in furtherance of his defense, despite those motions being unsuccessful. Our courts are understandably wary of second-guessing defense counsel's trial tactics. Where counsel articulates valid reasons for employing a certain strategy, counsel's choice of tactics will not be deemed ineffective assistance. *Whitehead v. State*, 308 S.C. 119,417 S.E.2d 530 (1992). *See also Dempsey v. State*, 363 S.C. 365, 610 S.E.2d 812 (2005) and *McLaughlin v. State*, 352 S.C. 476, 575 S.E.2d 841 (2003). Counsel articulated valid reasons for his choices in trial.[6]   Accordingly, this allegation is denied and dismissed.

---

[6]The respondent notes that the District Court in *Boseman v. Bazzle*, No. 08-7813, 2010 WL 489485 (4th Cir., Feb. 9, 2010) (unpublished) found that similar language in a PCR judge's order ("A defense counsel is not ineffective for making valid trial strategy decisions.") was an unreasonable application of *Strickland* because the PCR judge had applied a "per se rule of reasonableness" rather than a "presumption of reasonableness." The Court of Appeals, however, rejected this interpretation of the language at issue. *Id.* at **8-10. The Fourth Circuit concluded:

[T]he PCR court properly undertook the full *Strickland* performance prong analysis by concluding that trial counsel's conduct was made after appropriate investigation (it was part of a "trial strategy") and that it was a reasonable choice to have made because that strategy had "legal strength or force" and was "well grounded or justifiable." In other words, determination that the trial strategy was "valid" in this case was equivalent and synonymous to saying it was a "reasonable" trial strategy.
***
The PCR court's use of the phrase "valid trial strategy" simply does not transform its analysis into a per se rule of reasonableness. As detailed above, the whole of the PCR court's opinion shows that it understood *Strickland* and applied a presumption of reasonableness standard when analyzing Boseman's ineffective assistance claim. Accordingly, the district court erred in holding the state PCR court's analysis applied a per se rule of reasonableness and was therefore contrary to or an unreasonable application of *Strickland*.

*Id.* at **9-10.

(App. 611-12) (emphasis and footnote added).

With respect to counsel's failure to impeach or discredit the witness with two

prior allegations of rape, the PCR judge found:

> As to the allegation of ineffective assistance of counsel in that
> counsel failed to impeach or discredit the witness with two prior
> allegations of rape, this Court finds this claim is without merit. A
> review of the record shows that counsel made a motion *in limine*
> to present testimony from a doctor who had treated the victim in
> an attempt to establish that she had made prior false
> accusations of rape. Judge Barber ruled that Applicant had
> failed to establish that the prior accusations were false and thus
> any testimony regarding the prior accusations was inadmissible.
> The record shows that counsel was able to vigorously and
> adequately cross-examine the victim to establish a history of
> mental illness as well as attention-seeking behavior. This
> testimony was vital in Applicant's defense and counsel was able
> to use this information in his closing argument. The record
> clearly refutes Applicant's assertions and accordingly, this
> allegation is denied and dismissed.

(App. 613).

The petitioner argues that counsel was ineffective "for not objecting and

showing evidence that the alleged victim wasn't a credible witness, and throughout [the] trial

transcript, the alleged victim's story constantly changed.  Trial Transcript PG. 36, Line 8-11"

(doc. no. 1-3 at p. 2).  He further contends that "Dr. Merlin should have been allowed to

testify as an expert witness to substantiate the alleged victim's [lack of] credibility" (*id*. at pp.

2-3).  The petitioner is not entitled to relief.

First, the record shows that counsel did move to be allowed to cross-examine

the victim as to the prior accusations that she had been raped.  However, the trial judge

denied counsel's motion and ruled that the proffered evidence was inadmissible as a matter

of state law. This court is bound by the state court's construction of South Carolina law.  *See*

*Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("We have stated many times that 'federal

habeas corpus relief does not lie for errors of state law.' ... Today, we reemphasize that it is

not the province of a federal habeas court to reexamine state-court determinations on

23

state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States") (citations omitted).  Nor did the petitioner advance a different theory for the admissibility of the proffered evidence from that argued by counsel at trial, including Dr. Merlin's testimony. Thus, he cannot show either deficient performance or prejudice under *Strickland*, with respect to the handling of this evidence.

Furthermore, the manner and extent of cross-examination should not be second-guessed.  *See Sallie v. North Carolina*, 587 F.2d 636, 640 (4th Cir. 1978) (*Marzullo v. Maryland*, 561 F.2d 540 (4th Cir. 1977) not intended to promote judicial second-guessing on questions of strategy as basic as handling of a witness).  Notwithstanding the petitioner's complaint about counsel's representation, counsel's cross-examination of the victim and the other prosecution witnesses fully set forth enough information so that the jury could properly assess the victim's credibility and counsel could demonstrate the supposed lack of it.  *See Mills v. Singletary*, 161 F.3d 1273, 1288 (11th Cir. 1998) (quoting *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1371 (11th Cir. 1994)  (defendant's Sixth Amendment right to confront witnesses is "'satisfied where the cross-examination permitted exposes the jury to facts sufficient to evaluate the credibility of the witness and enables defense counsel to establish a record from which he can properly argue why the witness is less than reliable'").

Through trial counsel's cross-examination and the State's own case, the jury was aware of the following:

> • the victim had previously lived in "a place where people that are recovering from alcohol and drug use go[] to recover" (App. 141);
>
> • she was in that facility for treatment of a crack cocaine problem (App. 142);
>
> • she had been a patient of the mental health system "[m]ost of my life" (App.143;

• her diagnoses included mild mental retardation (App. 143-44), anorexia (App. 187), bipolar disorder (App. 187), depression (App. 187), and epilepsy (App. 187);

• in addition to medication for epilepsy, she was taking Paxil (to treat panic attacks and help with concentration), and Seroquel (App. 189-90);

• she probably was taking medications when the crimes occurred (App. 190-91);

• she would occasionally stop taking her medications "because it made me so drugged up" (App. 190-91);

• "there was a point in my life that I did not really know my age because I was confused because I knew there was two birth certificates and two social security numbers" (App. 147-48; 370-71);

• on cross-examination, she admitted that she did not know her age (App. 180-82);

• she was unable to tell the first officer whom she met her own age, and she obtained that information from two other persons who were present (App. 252-54);

• she had "a lot of emotional problems" as the result of her mother abandoning her (App. 182). Also, she had lived in "35 different places, hospitals, group homes, [and] foster homes" (App. 183);

• she had been receiving treatment for a number of years at the Columbia Area Mental Health Center, and she was seeing a therapist at the time of trial (App. 184);

• in the past, she "always had fear of [being abused] because that's all I've ever known. . . .[A]ll I've ever known is people hurting me or beating me up or hitting on me and stuff" (App. 187);

• she gave two statements to Inv. Slicer, from the Richland County Sheriff's Department, and, in the first statement, she did not mention that the petitioner had digitally penetrated her (App. 176-78; 198-99);

• she admittedly did not tell Inv. Slicer "the whole truth" in the first statement, and she only told the "truth" eight days after the offense (App. 199-200; *see also* App. 371-73);

25

• she had also told Inv. Slicer that the perpetrator had dated her foster mother "years ago" and she "had seen him years ago . . . but that's incorrect" (App. 201-02; *see also* App. 308);

• she had met with Inv. Slicer "three or four times" early in the investigation. Also, she liked Inv. Slicer, whom she described as "a good person" (App. 192);

• she liked the female prosecutor, who was "cool," and she had met with this prosecutor "four or five times." (App. 192-93);

• she "told Investigator [Slicer] that, at some point, something like snot came out of [the petitioner's] penis;" and she wiped that substance on her pants" (App. 197-98; 376-77);

• she gave the blue jeans that she had been wearing to Inv. Slicer two days after the assault. Inv. Slicer then sent the jeans to SLED, for testing, to see if there was semen on them (App. 339-40; 377);

• although the pants were examined twice, SLED was unable to detect the presence of semen (App. 340; 377-80);

• the incident report of the responding officer noted that "there was no visible injury on the victim" and a similar notation was made in his supplemental incident report. The supplemental incident report also noted that there was "no complaint of nonvisible injuries" (App. 254);

• the responding officer testified that "[t]he house [where the victim was living] is known to have people that may be a little mentally ill. And . . . one of the two females also stated that [the victim] is mentally ill" (App. 254-55);

• the responding officer's "understanding [was] that there was . . . no penile penetration [and] no digital penetration" (App. 255);

• on the day of the offense, "Vee" was teaching the victim how to ride the bus (App. 327-28);

• the victim sometimes acted childish, she was naive, and it appeared to Vee that the victim had led a sheltered life (App. 329);

• "she has difficulty in social situations," and she is insecure (App. 329-30);

• Vee did not see any visible injuries on the victim on the night of the assault (App. 330);

• she told Vee that the petitioner forced her to perform oral sex on him (App. 330-31);

• she had attended N.A. meetings (App. 186); and

• she had a prior fraudulent check conviction in the year before the trial (App.145-46).

Trial counsel later utilized much of this information in his closing argument to mount a vigorous attack on the victim's credibility (*see* App. 427-36). Trial counsel did not merely subject the victim's credibility to "adversarial testing"; he provided the petitioner's jury with a whole litany of reasons to doubt the victim's credibility. However, the jury still found that her story was credible. Based upon the foregoing, the petitioner has failed to show his trial counsel's performance was deficient in this regard, and he has further failed to show prejudice under *Strickland*.

**Ground One (8) - Newly Discovered Evidence**[7]

In Ground One (5) and in this ground, the petitioner alleges that he is entitled to relief based upon "newly discovered evidence" consisting of a note supposedly mailed to him by the victim's sister, Tina Schlarbaum, in which she informed the petitioner that the victim had previously made false reports of sexual assaults and that the victim had lied about the assault in this case (*see* doc. no. 1-1). In his state PCR proceedings, the petitioner claimed that trial counsel could have obtained the letter if he had subpoenaed certain records the petitioner asked him to subpoena. At his PCR hearing before Judge Keesley, the letter was made part of the record, over the State's objection that he had not laid a proper foundation and that it contained hearsay (App. 540-46). Counsel testified that the

---

[7]This ground has been taken out of order because the allegations in it overlap with allegations made in Ground One (5).

27

victim's sister never contacted him and that he "[a]bsolutely" would have investigated that further if she had contacted him because "my defense was that [the victim] was lying and she was not telling the truth and she had claimed rape before. And, yeah, . . . certainly if I had known about the sister, after reading that letter, I would have called her as a witness" (App. 558).

The PCR court considered the issue regarding the letter and stated as follows in the Partial Order of Dismissal:

> As to the allegation of newly-discovered evidence, Applicant presented a letter purported to be from the sister of the victim. This Court finds that this issue must be continued for Applicant to have the opportunity to present evidence to support this claim. All other issues are denied and dismissed. The only issue remaining for review is the issue of newly-discovered evidence.

(App. 614). Accordingly, an evidentiary hearing into the issue was convened on June 7, 2007, before Judge Childs. The petitioner "was given the opportunity to present the testimony of the victim's sister to authenticate the letter"; however, he did not do so (App. 600-601, 619). At the outset of the hearing, Assistant Attorney General Brown recapped what had occurred in the April 2007 hearing. Then, he stated that "I have spoken with Mr. Johnson. This has been set for some time. I know they are going to have -- I think he will testify that they tried to locate her and haven't." As a result, he moved to dismiss this allegation "for failure to prosecute" (App. 584-85). The petitioner's collateral counsel admitted that the witness was not present. However, he stated that "there [are] some other circumstances" to which his investigator would testify (App. 585).

Mr. Amos Jones testified that he was an investigator whom collateral counsel had hired to locate Ms. Schlarbaum and have her present in court. He testified as follows: "I spoke to her on two occasions, and she informed me that she was just moving into a new location in Kershaw County. She would not give me the location, but she gave me a telephone number, and we have talked on the telephone on two occasions" (App. 589-91).

28

Also, she told Mr. Jones, on the day before the hearing, that she would be present for the hearing and that she would testify consistently with the letter. However, she did not show for court that morning, and Mr. Jones did not find her although he had looked in every courtroom. Mr. Jones further testified that he had received a phone call several minutes before he testified. However, the telephone number was different, and he speculated that the number may have been her grandmother's, so he had not returned the call (App. 591).

> Judge Childs considered the issue and found as follows:
>
>> Here, the Applicant presented a letter from someone claiming to be the sister of the victim in this case. The Applicant was given the opportunity to locate the author of the letter to lay the foundation for the letter and authenticate the letter. The Applicant was unable to do so. This court finds that the letter, by itself, would not be admissible at a new trial as it is clearly hearsay. Additionally, the letter is being offered for its impeachment value to question the character of the victim. Clearly, the Applicant has failed to meet his burden of proving newly discovered evidence in this case. Accordingly, the remaining allegation is denied and dismissed with prejudice.

(App. 620).

To the extent this claim is raised as a free-standing allegation of after-discovered evidence, Judge Currie has already granted summary judgment on this issue as it was raised in Ground Two of the federal petition (*see* 2/10/10 R&R at pp. 23-25, doc. no. 26; 3/12/10 Order adopting R&R, doc. no. 34). Likewise, the petitioner is not entitled to relief based upon the allegation that his trial counsel was ineffective in failing to present this evidence in state court. The petitioner cannot meet his burden of establishing Sixth Amendment prejudice because he never properly authenticated the letter by presenting the author of it. *See e.g., Beaver v. Thompson*, 93 F.3d 1186, 1195 (4th Cir. 1996) ("However, an allegation of inadequate investigation does not warrant habeas relief absent a proffer of what favorable evidence or testimony would have been produced.") (citing *Bassette v. Thompson*, 915 F.2d 932, 940-41 (4th Cir. 1990) (petitioner's allegation that attorney did

ineffective investigation does not support relief absent proffer of the supposed witness's favorable testimony)).  South Carolina also follows this rule.  *See Bannister v. State*, 509 S.E.2d 807, 809 (S.C. 1999) ("'The applicant's mere speculation what the witnesses' testimony would have been cannot, by itself, satisfy the applicant's burden of showing prejudice.'") (quoting *Glover v. State*, 458 S.E.2d 538, 540 (S.C. 1995)).  The PCR judge relied upon this rule in rejecting the claim that the petitioner was entitled to relief based upon after-discovered evidence (App. 620).  Based upon the foregoing, this claim fails.

**Ground One (6) - Failure to Object to**
**Fingerprint and Analysis of Fracture**

The petitioner further alleges that trial counsel was ineffective for not objecting to the testimony of fingerprint analysis and the "analysis of fracture."  The respondent argues that the state courts' rejection of this claim was not "contrary to" and did not involve an "unreasonable application of" clearly established United States Supreme Court precedent. This court agrees.

As discussed in the Statement of Underlying Facts above, the petitioner handed the victim a piece of paper (State's ex. 19) with the phone number for the "Family World Center," and the victim put the paper in her back pocket (App. 154-56; 313-14).  The victim later gave law enforcement this piece of paper (App. 249-51).  An arrest warrant was served on the petitioner, and the Sheriff's Department received consent to search the trailer (App. 346-47).  Officers seized a daytimer in the search (App. 357).  The prosecution's evidence showed that State's Exhibit 19 was torn from the daytimer (App. 214-17) and that the petitioner's fingerprints were found on it (App. 289-95).  The church and the telephone number written by the petitioner on State's Exhibit 19 were fictitious (App. 341-42).

The petitioner testified at the PCR hearing that the SLED examiner testified that he "only could get a partial thumbprint off [of] the paper.  And the partial thumbprint supposed to match my paper."  The petitioner felt that the paper in question, State's Exhibit

19, was important because the victim "showed this paper to seven different people," but her fingerprints were not on it. In the petitioner's estimation, this corroborated that he did not give it to her (App. 539-41).

> Trial counsel testified as follows:
>
> I hired Don Girndt, who is . . . a forensic expert, who came, looked at the piece of paper. And this was a piece of paper that the victim had. She had a corner torn piece of paper and there was a thumbprint right on the piece of paper. And the State's investigation, their expert said it was his fingerprint. My independent investigator, Don Girndt, said that was his fingerprint. And also they had another expert who analyzed the tear who said that the piece of paper was torn from an address book that was found in a search of Mr. Myers' residence. And they had an expert who came in and said that the tear matched, so I had Don Girndt look at that as well, and he also concluded that that was accurate, that the tear, according to his opinion, came from that address book. So I had an independent investigator look into those two issues.

(App. 557). Trial counsel discussed the test results with the petitioner (App. 557-58).

The PCR judge (Judge Keesley) rejected the petitioner's contention that counsel was ineffective for not objecting to the fingerprint evidence:

> As to the allegation of ineffective assistance of counsel in that counsel failed to object to the fingerprint analysis, this Court finds this claim is without merit. Counsel testified that he had an independent investigator analyze the fingerprint and establish the same results that the police had established. Additionally, the investigator was able to match the tear in the paper with the fingerprint with the tear from the day-planner from which the paper was torn. Applicant has failed to offer any evidence of what else counsel could have done to object to the fingerprint analysis and has clearly failed to meet his burden of proof. Accordingly, this allegation is denied and dismissed.

(App. 613).

Trial counsel hired an expert to investigate the circumstances of both the thumbprint analysis and the determination of the origin of State's Exhibit 19, and the defense expert confirmed that the State had correctly analyzed both matters. Because the defense expert would have further corroborated the State's case against the petitioner, the petitioner

31

cannot show deficient performance resulting from counsel's failure to present the defense witness and thereby lose his right to the last closing argument in the process.

Further, the evidence in question was admissible because this evidence tended to corroborate testimony from both the victim and from Vee, and because it circumstantially tended to prove the petitioner's guilt. Also, its probative value was not substantially outweighed by its prejudicial effect. This is particularly true in light of the victim's testimony concerning the crimes. Thus, counsel was not deficient in failing to object. Further, in spite of trial counsel's failure to challenge the admissibility of the evidence, he did elicit that SLED had not done any fingerprint testing on the sheet of paper from the petitioner's daytimer, from which State's Exhibit 19 originated (App. 302).

There is likewise no merit to the petitioner's suggestion in his PCR testimony that the absence of the victim's fingerprints on State's Exhibit 19 corroborated that he did not give it to her (App. 539-41). The presence of his thumbprint circumstantially established that he had touched it, and other witnesses corroborated the victim's story that she was in possession of the document, which she later turned over to law enforcement. Thus, the presence of his thumbprint circumstantially established that he gave it to her.

Based upon the foregoing, this claim fails.

### Ground One (7) - Trial Counsel and the State Withheld Valuable Evidence

The petitioner alleges in Ground One (7) that "[t]rial counsel and [the] State withheld valuable evidence." Specifically, he complains because the "DNA report from hair and debris collected from the alleged victim's clothing," as well as the clothing itself, were never introduced. He further complains because the SLED experts who performed the DNA testing did not testify.

As discussed above, the petitioner testified that the State had taken samples of his blood and compared it to the DNA that they had "[f]ound on the victim clothes and the

32

hair fiber that they had found on the victim." However, this did not match him (App. 528; 530-32; 535; 546-47). Counsel also told the petitioner that "he was going to call the DNA expert to testify on my behalf[,] . . . that he was going to present the evidence that I had given to him and that would exonerate me, the jury would have enough evidence to come back and bring a not guilty verdict." However, counsel did not present any evidence (App. 538-39).

Trial counsel testified that they discussed all aspects of the case. "We discussed trial strategy. I went over the discovery with him." Also, "one of the big things in the case was . . . that . . . [t]here was no DNA, and there was a DNA report that said that the results were negative. So I did go over that with him. That was a huge part of the defense" (App. 550-51). Counsel explained that "one of my best arguments was that the victim claimed that there was semen, that he had ejaculated and she had rubbed semen on her pants. And they tested the pants for DNA, came back negative. So that was one of the big arguments I had in my case that she wasn't telling the truth" (App. 551).

The petitioner had always maintained that he had not done anything to the victim and that he did not know her, so counsel's defense strategy was "sort of an all-or-nothing strategy. Either he . . . did it or he didn't do it, but there was no in between" (App. 554-55). Counsel felt that he could adequately attack the victim's credibility through cross-examination. Further, he and the petitioner had discussed that the petitioner did not want to testify. "[S]o I was trying to get the last closing argument. And there was no witness I had that I felt would make any difference and it would cause me to lose the last closing argument" (App. 555-56).

The PCR judge found that the petitioner's allegation was without evidentiary support. He found that trial counsel had testified that he was aware that there was no DNA evidence collected from the victim and that counsel was able to elicit this information "on cross-examination of the State's witnesses as well as incorporate that information in his

closing argument in an attempt to establish that there was no sexual assault" (App. 613-14). In light of this testimony, the PCR judge found that the petitioner "has failed to establish that the solicitor withheld any evidence and has failed to meet his burden of proof in establishing that counsel was ineffective in any way regarding the DNA evidence. Accordingly, this allegation is denied and dismissed" (App. 614).

       The state courts' rejection of this claim was not "contrary to" and did not involve an "unreasonable application of" clearly established United States Supreme Court precedent. In *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999), the United States Supreme Court discussed the applicable law under *Brady v. Maryland*, 373 U.S. 83 (1963), observing that "the term '*Brady* violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence;" however, "strictly speaking, there is never a real '*Brady* violation' unless the non-disclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." 527 U.S. at 281. Thus, the Court recognizes three components of a true *Brady* violation. "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Id.* at 281-82. As argued by the respondent, in the present case, there was no *Brady* violation because the evidence was clearly provided to trial counsel before the petitioner's jury trial.

       Furthermore, there was no ineffective assistance of counsel. First, counsel had the DNA test results when he made a reasonable strategic decision not to present this or any other evidence because he did not want to forfeit the substantial right to final closing argument, and he felt that he could adequately elicit any impeaching information through cross-examination. The reasonableness of his assessment is supported by the trial record and the petitioner's assent to this strategy. *See Bell v. Evatt*, 72 F.3d 421, 429-30 (4th Cir. 1995) ("We are not holding that a defendant's consent to trial strategy in itself, vitiates all

34

claims of ineffective assistance of counsel.  Rather, we recognize consent as probative of the reasonableness of the chosen strategy and of trial counsel's performance.").

Although counsel did not introduce the DNA report itself or present the SLED examiners because of his chosen strategy, he established that the victim "told Investigator [Slicer] that, at some point, something like snot came out of [the petitioner's] penis," and she wiped that substance on her pants (App. 197-98; 376-77).  Also, she gave the blue jeans that she had been wearing to Inv. Slicer two days after the assault.  Thereafter, Inv. Slicer sent the jeans to SLED for testing (App. 339-40; 377).  The pants were examined twice by SLED. However, the SLED examiners were unable to detect the presence of semen (App. 340; 377-80).

Thus, the information that the petitioner claims counsel was ineffective in not presenting was already before the jury, albeit not in the same fashion that the petitioner now argues that it should have been presented.  This does not establish deficiency in counsel's chosen strategy.  Further, counsel would have lost the right to have final closing argument if he had presented any witnesses.  Based upon the foregoing, the petitioner cannot show prejudice under *Strickland*, since the evidence he claims should have been presented was actually before the jury, along with the other evidence discussed above bearing on the victim's credibility.

Based upon the foregoing, this claim fails.

### Ground One (9) -    Conclusion of Trial Counsel's Ineffective Assistance and Prejudicial Error

In this ground, the petitioner contends:

[T]rial counsel was ineffective  for not preparing a defense, and for failure to present any evidence on behalf of the [petitioner], such as the DNA expert's independent expert witness, M.D., nurse, police report history of alleged victim accusing other men of raping her.  Also, her mental health dr. and records etc.

(Doc. No. 1-3 at p. 4).

35

These issues have been analyzed above in Grounds One (5), (7), and (8). Furthermore, similar issues were discussed and rejected in Judge Currie's prior order, which adopted and incorporated Judge Catoe's Report and Recommendation (*see* 2/10/10 R&R at pp. 19-21, doc. no. 26; 3/12/10 Order adopting R&R, doc. no. 34).   Based upon the foregoing, this allegation is without merit.

### Ground One (10) - Failure to Object and Preserve issues for Appeal

The petitioner next contends that his "trial counsel was ineffective for [failing] to object to and preserve these issues for appeal and any other issues that may have been affected by the [the petitioner]'s counsel's deficient performance" (doc. no. 1-3 at p. 5).   In his response in opposition to the supplemental motion for summary judgment, the petitioner explains this ground as follows,"[B]ecause trial counsel didn't object to the sentences, it constituted cruel and unusual punishment" (pet. resp. supp. m.s.j. at p. 7).   He complains that trial counsel's failure to object to his sentences resulted in his imprisonment where he was forced to sleep on steel for four months, was stabbed by a cellmate, and was beaten by fellow prisoners (*id*.).

The claim is procedurally barred.   This issue was not raised by the petitioner in his state PCR proceedings and was therefore not ruled upon by the PCR judges (App. 487-88, 493-99, 608-21).   Thus, the issue was not preserved for appellate review.   *Hyman v. State*, 299 S.E.2d 330, 331 (S.C. 1983) (petitioner failed to preserve for review on appeal claim that trial counsel was ineffective for failure to object that sentences constituted cruel and unusual punishment where point was not raised in PCR application or at hearing).

If a petitioner before a federal district court fails to raise a claim in state court and is precluded by state rules from returning to state court to raise the issue, he has procedurally bypassed his opportunity for relief in state courts.   In such a case, a federal district court is barred from considering the habeas claim absent a showing of cause and

actual prejudice or that failure to consider the claim will result in a fundamental miscarriage of justice, as the exhaustion requirement is technically met and the rules of procedural bar apply. *Matthews v. Evatt*, 105 F.3d 907, 916 (4th Cir. 1997) (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).  A prisoner can demonstrate cause for procedural default by proving that he was deprived of constitutionally effective assistance of counsel.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  However, if counsel performs at a constitutionally acceptable level, then counsel's performance cannot constitute cause for procedural default. *Id.* at 486-88.  Here, the petitioner cannot show cause for the default since the issue could have been raised in the state PCR court.  To the extent he claims his PCR counsel was ineffective in failing to raise the issue, the ineffective assistance of state habeas counsel cannot excuse procedural default given that there is no Sixth Amendment right to effective assistance of counsel in state habeas proceedings.  *See Barraza v. Cockrell*, 330 F.3d 349, 352 (5th Cir.2003) ("there is no constitutional right to competent habeas counsel," and state statutory requirement for the appointment of competent habeas counsel does not create a constitutionally secured right); *Weeks v. Angelone*, 176 F.3d 249, 274 (4th Cir.1999) ("[T]his Court does not recognize a constitutional right to counsel on state habeas . . . ."). A petitioner may establish a fundamental miscarriage of justice by showing that a constitutional error probably resulted in the conviction of one who is actually innocent.  In order to raise a claim of actual innocence, a prisoner "must present evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *Schlup v. Delo*, 513 U.S. 298, 316 (1995). The petitioner has made no such showing here. Accordingly, the claim is procedurally barred.

37

***Ground One (11) - Trial Judge Failed to Rule on DNA Evidence***

The petitioner complains that the trial judge "never ruled on the DNA evidence." As argued by the respondent, this is an allegation that the petitioner was required to raise at trial and on direct appeal.  *See* S.C. Code Ann.§ 17-27-20(b) (1986) ("This remedy is not a substitute for nor does it affect any remedy incident to the proceedings in the trial court, or of direct review of the sentence or conviction")*; Drayton v. Evatt*, 430 S.E.2d 517, 520 (S.C. 1993) (issues that could have been raised at trial or in direct appeal cannot be asserted in PCR application absent a claim of ineffective assistance of counsel).  To the extent the petitioner claims his trial counsel was ineffective with regard to the DNA evidence, that allegation has been addressed above with regard to Grounds One (7) and (9).  Based upon the foregoing, this allegation is without merit.

***Ground One (12) - Failure to Request Jury Instruction***
***on Criminal Sexual Conduct in the Third Degree***

In this allegation, the petitioner asserts that trial counsel was ineffective for failing to request a jury instruction on the lesser-included offense of CSC in the third degree, under S.C. Code Ann. § 16-3-654(1)(b),[8] or assault and battery of a high and aggravated nature ("ABHAN") "when the evidence specifically pointed to the fact the victim was mentally defective (retarded)."  He further alleges that the "State lacked the adequate foundation to secure an indictment . . . and the State knew beforehand that the victim was retarded" (doc. no. 1-3 at p. 6).

---

[8]This statute provides in pertinent part:

(1) A person is guilty of criminal sexual conduct in the third degree if the actor engages in sexual battery with the victim and if any one or more of the following circumstances are proven:
\*\*\*
    (b) The actor knows or has reason to know that the victim is mentally
    defective, mentally incapacitated, or physically helpless and aggravated
    force or aggravated coercion was not used to accomplish sexual battery.

S.C. Code Ann. § 16-3-654(1)(b).

38

Summary judgment has been granted to the respondent on the petitioner's argument that his trial counsel was ineffective for not requesting a jury instruction on ABHAN (*see* 2/10/10 R&R at pp. 16-19, doc. no. 26; 3/12/10 Order adopting R&R, doc. no. 34). Accordingly, that issue is moot.

As to the petitioner's claim that his trial counsel was ineffective for failing to request a jury instruction on the offense of CSC in the third degree, the claim is procedurally barred because it was not raised in the state PCR proceedings. As with Ground One (10), the petitioner cannot show both cause for the procedural default and prejudice as a result of the alleged constitutional violation, or that the failure to review the constitutional claim will result in a fundamental miscarriage of justice. Accordingly, the ground is procedurally barred.

The petitioner also claims that the ""State lacked the adequate foundation to secure an indictment . . . and the State knew beforehand that the victim was retarded" (doc. no. 1-3 at p. 6). However, the petitioner does not specify how or why the State allegedly lacked the adequate foundation to secure an indictment. Federal habeas is unavailable to retry state issues. *Milton v. Wainwright*, 407 U.S. 371, 377 (1972). "A federal court may not issue the writ on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1989). A state court's determination that one of its courts had jurisdiction over a purely state law criminal charge is not a matter cognizable in federal habeas corpus. *See Wright v. Angelone*, 151 F.3d 151, 158 (4th Cir. 1998) (citing *Wills v. Egeler*, 532 F.2d 1058, 1059 (6th Cir.1976)). *See also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("It is not the province of a federal habeas corpus court to reexamine state-court determinations on state-law questions."); *Ashford v. Edwards*, 780 F.2d 405, 407 (4th Cir. 1985) (deficiencies in state court indictments are not ordinarily the basis for habeas relief unless deficiency made trial fundamentally unfair as to amount to a deprivation of the defendant's right to due process). There is no indication here that any alleged defect in the indictment made the

39

petitioner's trial so fundamentally unfair as to amount to a deprivation of his right to due process. Accordingly, this claim fails.[9]

### Ground One (13) - Actual Innocence

Lastly, the petitioner alleges a free-standing claim of actual innocence based upon the lack of DNA evidence. The petitioner contends that "he had DNA taken from him on four [occasions]. Each time the DNA results came back negative." He further maintains that this requires his conviction and sentence to be vacated (doc. no. 1-3 at p. 7).

The Supreme Court has established that there are two types of "actual innocence" claims: substantive and procedural. Where a petitioner contends that he is entitled to habeas relief because newly discovered evidence shows that his conviction is factually incorrect, that is a substantive claim, and it is not cognizable in federal habeas corpus. *See Herrera v. Collins*, 506 U.S. 390, 400 (1993) ("claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding"). A showing of actual innocence can also serve as a "gateway" to the review of otherwise procedurally defaulted constitutional claims. *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

Here, the petitioner does not appear to seek to excuse his procedural default of this or other allegations. Rather, he raises a substantive claim for relief based upon his "actual innocence." Neither the Supreme Court nor the Fourth Circuit Court of Appeals has ever found facts sufficiently compelling to grant the writ for a claim of innocence without the

---

[9]Summary judgment has already been granted on the petitioner's claims that trial counsel was ineffective because he did not object to the "constructive amendment" of the CSC indictment during trial and because he did not object to "the improper wording" of the CSC indictment (*see* 2/10/10 R&R at pp. 12-16, doc. no. 26; 3/12/10 Order adopting R&R, doc. no. 34). The instant ground is raised as a substantive claim alleging in conclusory and general terms that the State did not establish an "adequate foundation" for an indictment.

claim of an underlying constitutional violation.  *See Buckner v. Polk*, 453 F.3d 195, 199 (4th Cir. 2006) ("[C]laims of actual innocence are not grounds for habeas relief even in a capital case") (quoting *Rouse v. Lee*, 339 F.3d 238, 255 (4th Cir. 2003) (en banc) (citing *Herrera*, 506 U.S. at 405)).

Further, "if free-standing actual innocence claims were cognizable on federal habeas review, 'the threshold showing for such an assumed right would necessarily be extraordinarily high.'"  *Id.* at 199 (quoting *Herrera*, 506 U.S. at 417).  The petitioner cannot meet this high standard.  The petitioner's argument ignores the other evidence that reasonably tended to prove that he was guilty of the crimes of which he was convicted.  Of importance to the CSC charge, he fails to recognize that the indictment charged him and the State proved that he digitally penetrated the victim, an act that would not necessarily result in the presence of his DNA.

To the extent the petitioner's complaint relates to the sufficiency of the evidence to convict, this issue was addressed and rejected in Judge Catoe's Report and Recommendation with regard to the petitioner's Ground Two (*see* 2/10/10 R&R at pp. 24-25, doc. no. 26; 3/12/10 Order adopting R&R, doc. no. 34).

Based upon the foregoing, this ground for relief fails.

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, it is recommended that summary judgment be granted as to the remaining grounds in the petition.  Should the district court adopt this court's recommendation, any pending nondispositive motions will be rendered moot.

March 4, 2011                                          s/Kevin F. McDonald
Greenville, South Carolina                   United States Magistrate Judge

41